UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| XCESS LIMITED,<br><br>Plaintiff,<br>v.<br><br>AMAZON.COM SERVICES, LLC,<br><br>Defendant. | CASE NO. 2:25-cv-00507-RSL<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS |

This matter comes before the Court on defendant's second motion to dismiss (Dkt. 28); plaintiff's response (Dkt. 41); defendant's reply (Dkt. 44); and defendant's notices of supplemental authority (Dkts. 60, 62, 64, 74, 80, 83). Having reviewed these filings as well as the record herein, the Court DENIES the motion to dismiss as explained below.

## I. Background

In its complaint (Dkts. 1, 79), Plaintiff Xcess Limited alleges the following:

Plaintiff is "one of the largest inventory liquidation companies in the United States." *Id.* at ¶ 18. Plaintiff first contracted with defendant Amazon.com Services, LLC, in or about 2016, agreeing to "purchase certain products owned by Amazon at specific

fulfillment centers." *Id*. at ¶ 19. As a general matter, Amazon Services contracts with liquidators like plaintiff to remove "[s]low-selling, non-selling or returned products warehoused at Amazon fulfillment centers." *Id*. at ¶ 2. This creates more space at fulfillment centers "that could be used to warehouse faster-selling products." *Id*. "[I]n or about 2020," Amazon "decided" to require liquidators to also purchase third-party seller products housed at Amazon's warehouses. *Id*. at ¶ 3. In the context of this case, third-party sellers are known as "Fulfillment by Amazon" ("FBA") sellers. *Id*. at ¶ 1.

Under a 2022 Liquidation Agreement between plaintiff and defendant, the sales price for liquidation merchandise was to be either (a) a fixed price for a particular shipment or pickup of liquidation merchandise that the parties mutually agreed to in writing, or (b) "a percentage of Amazon's cost of goods sold ('COGS') with respect to the Liquidation Merchandise as specified and agreed by the parties in the applicable Rate Schedule." Dkts. 79 at ¶ 56; 31 (Liquidation Agreement § 2.1). "Amazon Services breached the 2022 Liquidation Agreement when it charged Xcess for FBA products that Xcess purchased in an amount equal to the liquidation amount determined by Amazon's algorithm instead of an amount equal to Amazon Services' 'cost of goods sold.'" Dkt. 79 at ¶ 56. Amazon's algorithm considered the FBA Sellers' selling price. Dkt.1 at ¶ 25. The higher a product's selling price, the higher the amount the algorithm charged plaintiff. *Id*. at ¶ 26. The amount charged to plaintiff included "the contractually set amount" that Amazon was required to pay FBA Sellers for liquidation of their products *Id*. at ¶¶ 27, 28.

"[U]nscrupulous FBA Sellers" learned that "they could profit by charging exorbitant prices for inexpensive and/or shoddy goods because Amazon's liquidation algorithm resulted in them receiving payments well in excess of their costs of goods sold." *Id*. at ¶ 4. Amazon was aware of this problem but did not take proactive steps to resolve it because "Amazon benefitted financially" in that Amazon "charged its liquidators the full amount Amazon owed to FBA Sellers for the liquidated products plus the amount the FBA Sellers owed Amazon for liquidating the products on the FBA Sellers' behalf." *Id*. at ¶ 5. Amazon was attempting to "pass through charges" to liquidators like plaintiff, "with the promise to refund payments if and when Xcess ferreted out the [FBA seller] fraud," an arrangement that "not only created an enormous amount of work [for] Xcess, but also significantly increased the workload for Amazon Services' representatives, who had to process a growing volume of liquidator credit requests." *Id*. at ¶ 8.

Plaintiff began to "short pay invoices" from Amazon Services based on plaintiff's pending credit requests for charges from Amazon Services related to the FBA seller fraud. *Id*. "Amazon Services permitted Xcess to short pay invoices based on pending credit requests because Amazon Services could not keep up with them." *Id*. "Amazon Services also permitted Xcess, and presumably other liquidators, to submit invoice disputes that were more than 30 days old." *Id*.

"In 2024, Amazon Services decided to force Xcess, and presumably its other existing liquidators, to fully absorb the losses from the rampant FBA fraud." *Id*. at ¶ 9. "In addition," Amazon "demanded Xcess repay the amounts withheld based on still pending

credit requests." *Id*. Then, on July 30, 2024, "Amazon Services sent Xcess a Notice of Termination of Liquidation Agreement." Dkt. 79 at ¶ 39. On Aug. 13, 2024, counsel for Amazon Services sent plaintiff a Notice of Default and Payment Demand that demanded immediate payment of "$75,032,507.51 plus interest and costs." *Id*. at ¶ 40. Plaintiff responded by "refuting that Xcess had breached the 2022 Liquidation Agreement and explaining that Amazon Services (a) owed Xcess refunds for overcharges on FBA Products and (b) was liable for defaming Xcess." Dkt. 1 at ¶ 41.

This lawsuit followed, with plaintiff asserting claims for breach of contract, declaratory judgment, violation of the Washington State Consumer Protection Act, tortious interference with a prospective business relationship, and defamation. Dkt. 1 at ¶¶ 54–83. Plaintiff seeks to recover from Amazon "overpayments of nearly $140 million." Dkt. 79 at ¶ 12. Through its declaratory judgment claim, plaintiff also seeks "a declaration that Xcess does not owe to Amazon Services the approximately $75 million that Amazon Services contends Xcess still owes." *Id*.

## II. Discussion

### A. Pleading Standard Under Fed. R. Civ. P. 12(b)(6)

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6), the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). "We are not, however, required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." []*Twombly*, 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *U.S. v. Corinthian Colls*., 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule 8(a)(2), a party must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144–45 (9th Cir. 2021). In addition, the factual allegations in a complaint "must be enough to rise above the speculative level." *Twombly*, 550 U.S. 544 at 555 (2007). Finally, dismissal under Rule 12(b)(6) is proper "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

### B. First Cause of Action: Breach of Contract

Plaintiff alleges defendant breached their contract, "the 2022 Liquidation Agreement" (Dkt. 31), by charging plaintiff for FBA products "in an amount equal to the liquidation amount determined by Amazon's algorithm," rather than charging plaintiff "an amount equal to Amazon Services' 'cost of goods sold'" as required by the 2022 Liquidation Agreement. Dkts. 1; 79 at ¶¶ 54–60. Plaintiff also alleges that defendant breached the agreement by invoicing defendant "for loads that Xcess did not take, for items that Xcess never received, and for items that Xcess could not re-sell." *Id*. Plaintiff further alleges that defendant "breached the implied covenant of good faith and fair dealing by charging Xcess for FBA products with fraud-inflated prices and by requiring Xcess to identify which FBA products had fraud-inflated prices." *Id*.

#### 1. Relevant law

"In a breach of contract action, the plaintiff must prove that a valid agreement existed between the parties, the agreement was breached, and the plaintiff was damaged." *Univ. of Washington v. Gov't Emps. Ins. Co.*, 200 Wn. App. 455, 467 (2017). In addition, "[t]here is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569 (1991). However, "the duty arises only in connection with the terms agreed to by the parties" and "requires only that the parties perform in good faith the obligations imposed by their agreement." *Id*.

### 2. Algorithmic Liquidation Pricing and Erroneous Invoices

Plaintiff contends that defendant breached their contract by charging plaintiff for FBA products "in an amount equal to the liquidation amount determined by Amazon's algorithm," rather than charging plaintiff the amount prescribed in the parties' 2022 Liquidation Agreement.[1] Dkt. 1 at ¶¶ 54 – 60. Plaintiff alleges defendant also breached their contract by invoicing plaintiff "for loads that Xcess did not take, for items that Xcess never received, and for items that Xcess could not re-sell." *Id*. The parties' 2022 Liquidation Agreement states that the sales price for liquidation merchandise "will be":

> (a) such fixed price for a specific shipment or pickup of Liquidation Merchandise as the parties may mutually agree in writing (including e-mail) from time to time; or
> (b) a percentage of Amazon's cost of goods sold ("COGS") with respect to the Liquidation Merchandise as specified and agreed by the parties in the applicable Rate Schedule . . . .

Liquidation Agreement § 2.1 (Dkt. 31). The rate schedule attached as Addendum A to the 2022 Liquidation Agreement does not mention algorithmic pricing. Dkt. 31. Defendant argues that even assuming the truth of plaintiff's allegations, plaintiff has waived and released its breach of contract claims in three ways. Dkt. 28 at 14:8–15:21. All three of defendant's arguments fail.

***First***, defendant argues that the alleged pricing errors are covered by a provision in the Liquidation Agreement stating that "ALL LIQUIDATION MERCHANDISE IS

---

[1] The 2022 Liquidation Agreement is integral to and referenced throughout plaintiff's complaint, and it appears to be accepted by all parties as authentic. Dkts. 28 at 8 n.2; 31. Thus, it may be considered on a motion to dismiss under the doctrine of incorporation by reference. *Van Buskirk v. Cable News Network*, 284 F.3d 977, 980 (9th Cir. 2002).

CONVEYED TO LIQUIDATOR 'AS IS, WHERE IS' WITH ALL FAULTS AND DEFECTS AND WITHOUT ANY WARRANTY . . . ." *Id*. *See also* Liquidation Agreement § 10 (Dkt. 31). But this clause in the agreement, read in context, is about "faults and defects" of the liquidation merchandise and does not bar pricing claims. *See RL Liquidators LLC v. Amazon.com Servs., LLC*, No. 2:24-CV-02096-JHC, 2025 WL 2052611, at *2 (W.D. Wash. July 15, 2025). Defendant also argues that the release of liability contained in § 10 of the agreement bars plaintiff's breach of contract claims. Dkt. 28 at 14:8–15:21. But the release of liability in § 10 applies to "EACH SELLER OF LIQUIDATION MERCHANDISE," Dkt. 31, and the agreement's definition of "seller" makes clear that where, as here, FBA products are being sold to a liquidator, the FBA seller is the "seller" of those goods and Amazon is merely a facilitator of any sale between an FBA seller and a liquidator. *See* Liquidation Agreement § 1.1, 1.2.1 (Dkt. 31). Therefore, in this matter the release of liability in § 10 applies to the FBA sellers whose goods plaintiff purchased, not Amazon.

***Second***, defendant points to the "Doing Business With Amazon Liquidations" guide that is incorporated into the Liquidation Agreement. Dkts. 11-4; 28 at 14:26–15:9. *See also* Liquidation Agreement § 2.4 (Dkt. 31); Doing Business With Amazon Liquidations (Dkt. 11-4); *W. Washington Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 102 Wn. App. 488, 494 (2000). The incorporated guide states that disputes related to certain listed scenarios, including "Fraud: Fraudulent items" and "Pricing Error: Overcharge for an item due to a data error," must be submitted through a dispute resolution process. Dkt. 11-4 at

21. The guide also states that the dispute resolution process "is used to reconcile system issues and large operational mistakes due to Amazon-driven issues (e.g., charging a liquidator $1,200 for a box of water colors instead of $12.00)." *Id*. Plaintiff counters that the guide "does not relieve Amazon of its contractual obligations" to charge defendant "a percentage of Amazon's cost of goods sold ('COGS') with respect to the Liquidation Merchandise." Dkt. 41 at 14:20–15:3; Liquidation Agreement § 2.1 (Dkt. 31). In addition, plaintiff argues that the guide does not contemplate that defendant would "knowingly pass through fraud-inflated prices." *Id*. "Thus, the dispute resolution procedures do not cover the present situation." *Id*.

Plaintiff's complaint indeed alleges that defendant was "aware" of problems with its liquidation algorithm "but it did not proactively take steps to resolve it because, on information and belief, Amazon benefitted financially." Dkt. 1 at ¶¶ 4–5. The complaint also alleges that "Amazon Services acknowledged the problem in communications with Xcess . . . ." *Id*. *See also* ¶¶ 8, 23–36. In other words, through a mixture of "information and belief" pleading and allegations concerning defendant's own admissions to plaintiff, plaintiff alleges that defendant's conduct was not an operational mistake, an overcharge "due to a data error," a system issue, or an issue solely related to "[f]raudulent items," but was instead an active choice by Amazon to "pass through" to plaintiff, Dkt. 1 at ¶¶ 8, 27, the cost of FBA seller fraud rather than only charge plaintiff the contractually-mandated "percentage of Amazon's cost of goods sold ('COGS') with respect to the Liquidation Merchandise . . . ." Dkt. 41 at 14:20–15:3. *See also* Liquidation Agreement § 2.1 (Dkt. 31).

"The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted). In addition, "we relax pleading requirements where the relevant facts are known only to the defendant." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). Thus, here plaintiff has plausibly alleged that defendant intentionally and knowingly ignored its contractual obligation to defendant in order to pass the costs of FBA seller fraud through to plaintiff, conduct that is not listed as a trigger for the dispute resolution process imposed by the Liquidation Agreement § 2.4. Dkts. 11-4; 31.

***Third***, even if the dispute resolution process did apply here, the facts alleged in plaintiff's complaint are sufficient to show waiver of the dispute resolution process. In *RL Liquidators*, the court was faced with circumstances similar to those alleged here and found plaintiff had alleged sufficient facts to show Amazon had waived the dispute resolution process. No. 2:24-CV-02096-JHC, Dkts. 65; 69 at 10–11 (W.D. Wash. Feb. 19, 2026). *See also* Dkts. 11-4, 31. Xcess alleges that Amazon "promised to work with Xcess to correct overcharges, no matter when those invoice disputes were submitted" (Dkt. 1 at ¶ 5); "permitted Xcess to short pay invoices based on pending credit requests because

Amazon Services could not keep up with them" (*Id*. at ¶ 8)[2]; and "permitted Xcess, and presumably other liquidators, to submit invoice disputes that were more than 30 days old" (*Id*. at ¶¶ 8, 34–35). Thus, on the facts presently before the Court, the Court finds that Amazon has waived the dispute resolution process.

In its reply, defendant contends that regardless of the alleged waiver, plaintiff remains bound by the dispute resolution process because Section 11.5 of the 2022 Liquidation Agreement contains a "no waiver" clause that states:

> A party does not waive any right under this Agreement by failing to insist on compliance with any of the terms of this Agreement or by failing to exercise any right under this agreement. Any waivers granted hereunder are effective only if recorded in a writing signed by the party granting such waiver.

Liquidation Agreement § 11.5 (Dkt. 31). *See also* Dkt. 44 at 9:10–21. This argument fails because even though the parties agreed to be bound by the Liquidation Agreement, which included a "no waiver" clause, defendant "still had the ability later to orally waive certain conditions and be estopped from revoking such a waiver" as "the written [no waiver] provision does not prevent . . . conduct subsequent to the execution of the contract from constituting a waiver." *Gillani Consulting Inc. v. Daewoo Heavy Indus. Am. Corp.*, No. C05-0823-JCC, 2006 WL 3545467, at *8–9 (W.D. Wash. Dec. 7, 2006), *aff'd*, 300 F. App'x 466 (9th Cir. 2008) (analyzing a similar "no waiver" clause under Washington law). *See also*

---

[2] Defendant's dispute resolution process states: "Short payments are not permitted under any circumstances." Dkt. 11-4 at 22. The 2022 Liquidation Agreement also prohibits short payments. Liquidation Agreement § 2.4 (Dkt. 31).

Dkt. 41 at 16 n.5. Plaintiff's complaint does not state whether defendant's alleged communications waiving the dispute resolution process came orally or in the form of a writing (and, if in the form of a writing, whether that writing was signed by plaintiff or plaintiff's agent). Dkt. 1. Even so, following *Gillian Consulting* the form of the waiver does not matter. No. C05-0823-JCC, 2006 WL 3545467, at *8–9 (W.D. Wash. Dec. 7, 2006), *aff'd*, 300 F. App'x 466 (9th Cir. 2008) (finding oral waiver would be effective even though provision required a signed writing for any waiver). Further, taking the allegations in plaintiff's complaint as true, as the Court must at this stage, defendant's alleged waivers of the dispute resolution process were "unequivocal acts of conduct evidencing an intent to waive." *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375, 391 (2003) (citing *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 77 Wn. App. 137, 143 (1995)).

**3. Covenant of Good Faith and Fair Dealing**

Plaintiff contends that defendant "violated its duty of good faith and fair dealing by failing to address the fraud-inflated charges permeating its invoices to Xcess" and by "requiring Xcess to identify which FBA products had fraud-inflated prices." Dkts. 1 at ¶ 58; 41 at 17:15. Defendant counters that the Liquidation Agreement "expressly requires Xcess to identify pricing and product issues via the dispute resolution process . . . and that necessarily includes issues concerning FBA products with allegedly 'fraud-inflated prices'," therefore there can be no breach of the implied covenant. Dkt. 28 at 15:25–16:2. However, this Court has already determined, *see supra* II.B.2, that plaintiff is not alleging

a "Pricing Error: Overcharge for an item due to a data error." Dkt. 11-4 at 21. Rather, plaintiff has plausibly alleged that defendant intentionally and knowingly ignored its contractual obligation to defendant regarding "COGS" pricing (*see* Liquidation Agreement § 2.1) in order to pass the costs of FBA seller fraud through to plaintiff, conduct that is not listed as a trigger for the dispute resolution process (*see* Dkts. 11-4; 31). This alleged conduct prevented plaintiff from receiving the benefit of Amazon's performance of Section 2.1 of the Liquidation Agreement. Thus, plaintiff has adequately stated a claim for breach of the implied covenant of good faith and fair dealing. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569 (1991); *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1183–86 (W.D. Wash. 2013).

**C. Second Cause of Action: Declaratory Judgment**

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), requires the existence of an "actual controversy" within the Court's jurisdiction. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). "If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction." *Id*. (citing *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994)). In a private party contract dispute, a case is ripe for review where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Robinson*, 394 F.3d at 671 (9th Cir. 2005) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,*312 U.S. 270, 273 (1941)). If an actual controversy does exist between the parties, a court

must next decide, in its discretion, "whether to exercise its jurisdiction by analyzing the factors set out in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942), and its progeny." *Id*. at 669 (citing *Kearns*, 15 F.3d at 143–44 (9th Cir. 1994)).

Here, plaintiff seeks a declaratory judgment "that it owes no amounts to Amazon Services under the 2022 Liquidation Agreement or any other liquidation agreement." Dkt. 1 at ¶¶ 61–64. In its complaint, plaintiff alleges that on Aug. 13, 2024, Amazon demanded "the immediate payment of all sums due and owing under the Agreement, which as of July 29, 2024, is in the sum total of $75,032,507.51 plus interest and costs." Dkt. 79 at ¶ 40. In its June 2025 motion for protective order (Dkt. 52 at 3:7–9), defendant stated: "Should any of Xcess's claims survive a motion to dismiss, Amazon expects to bring counterclaims to collect on Xcess's outstanding balance." As discussed *supra* (II.B), plaintiff's breach of contract claim has survived defendant's present motion to dismiss. Therefore, the Court finds that as to the amounts Amazon alleges are owed to Amazon by plaintiff, "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Robinson*, 394 F.3d at 671 (9th Cir. 2005) (quoting *Maryland Cas. Co.,*312 U.S. at 273 (1941)). *See also City of Reno v. Netflix, Inc.*, 52 F.4th 874, 879 (9th Cir. 2022) ("A potential defendant may preempt a suit by a potential plaintiff—the latter of whom could sue pursuant to an independent cause of action—and seek a declaration that the potential plaintiff's claim would fail.").

Turning to *Brillhart* factors, the Court finds that in considering plaintiff's claim for declaratory judgment it would not be engaging in "needless determination of state law issues," encouraging forum shopping, or allowing "duplicative litigation." *Robinson*, 394 F.3d at 672 (9th Cir. 2005). Further, concerns of judicial administration, comity, and fairness to the litigants would not be adversely implicated given that a declaratory judgment here could "clarify the legal relations at issue" by determining whether plaintiff in fact owes defendant more than $75 million under their agreement. *Id*. *See also* Dkt. 79 at ¶ 40. Therefore, plaintiff has sufficiently stated a claim for declaratory judgment.

**D. Third Cause of Action: Violations of the Washington State Consumer Protection Act**

Under the Washington State Consumer Protection Act ("CPA"), it is unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. The Washington State Legislature has directed that the CPA "shall be liberally construed" so that "its beneficial purposes may be served." *Id*. "To prevail on a CPA action, the plaintiff must prove an '(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation.'" *Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 782 (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986)). Here, defendant argues that plaintiff has not adequately alleged the first and third elements of its CPA claim

("unfair or deceptive act or practice" and "public interest impact"). Dkts. 28 at 21–23; 44 at 13–15. Defendant does not contest the other three elements. *Id*.

**1. Unfair Act or Practice**

Showing an unfair act or practice alone is sufficient to establish the first element of a CPA claim. *Klem*, 176 Wn.2d at 787 (2013) ("The 'or' between 'unfair' and 'deceptive' is disjunctive."). The Washington State Supreme Court "has not yet attempted to define the phrase 'unfair acts of practices' for the purposes of our CPA." *Greenberg v. Amazon.com, Inc.*, 3 Wn.3d 434, 458, (2024), *as amended* (Aug. 16, 2024). Rather, it has "quoted with approval" the Congressional record relating to unfair practices and federal law:

> It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.

*Klem*, 176 Wn.2d at 786 (2013) (quoting H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914)). "Given that there is 'no limit to human inventiveness,' courts, as well as legislatures, must be able to determine whether an act or practice is unfair or deceptive to fulfill the protective purposes of the CPA." *Id*. Thus, the definition of unfairness under the CPA has been allowed to "evolve through a 'gradual process of judicial inclusion and exclusion.'" *Id*. at 785 (citing *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 334 (1989)).

There are presently "many ways" to show that an act or practice is unfair. *Greenberg*, 3 Wn.3d at 455–59 ("[O]ur CPA simply has no limitations on the range

of effect the defendant's [unfair] conduct must have for a plaintiff to state a cognizable claim to relief."). For example, showing "only that the defendant's conduct is in violation of public interest" is sufficient. *Id*. at 459 (citing *Klem*, 176 Wn.2d at 787 (2013)).[3] The "substantial injury test" in 15 U.S.C. § 45(n), embraced by both parties in this matter, is another way to determine whether a practice is unfair. *Id*. at 455–59; Dkts. 28 at 21:11–13; 41 at 26:13–15. However, while both parties here embrace the substantial injury test as articulated in § 45(n), both parties fail to note the *Greenberg* court's holding that "[i]n order to promote the liberal construction of the CPA," an earlier test known as "the three *S&H* criteria" still applies in Washington. *Greenberg*, 3 Wn.3d at 455–59 (citing *Klem*, 176 Wn.2d at 787).

Under the later test set forth in § 45(n), "an act or practice is 'unfair' when '[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'" *Id*. The *Greenberg* court indicated that while the three *S&H* criteria still apply in Washington, and while "there may even be additional ways that a plaintiff can show that [an] act or practice that is unregulated by statute is unfair," when a plaintiff has

[3] Plaintiff's complaint does not allege that defendant's conduct is in violation of public interest. Dkt. 1.

met the more recent substantial injury test in § 45(n) a court may resolve the matter on the basis of that test alone. *Id*.

The parties here solely debate element two of the more recent § 45(n) test: whether the injury alleged by plaintiff was "reasonably avoidable." Dkts. 28 at 21:11–22:1; 41 at 26:13–24; 44 at 14:22–15:3. Defendant claims the injury alleged here "was reasonably avoidable because Xcess had the contractual right to mitigate any injuries via the dispute resolution process." Dkt. 28 at 21:19–23 (citing Dkt. 1 at ¶ 8). Plaintiff counters that the "ineffectiveness and unworkability" of the dispute resolution process left plaintiff with "no meaningful ability" to mitigate its damages. Dkt. 41 at 26:21–24. Taking the allegations in plaintiff's complaint as true, plaintiff has plausibly alleged that defendant's dispute resolution process, although contractually mandated, was not effective in addressing the alleged overcharges to plaintiff that occurred due to the combination of (1) FBA seller fraud that was known to defendant; (2) defendant's alleged use of an algorithm that didn't follow the 2022 Liquidation Agreement's pricing terms and instead considered prices set by the FBA sellers; and (3) defendant's inability to keep up with invoice disputes and credit requests. Dkt. 1 at ¶¶ 4–8, 23–35, 66. *See also* Liquidation Agreement § 2.1 (Dkt. 31). Therefore, plaintiff has plausibly alleged that its damages were not "reasonably avoidable" under the substantial injury test in § 45(n). *Greenberg*, 3 Wn.3d at 459 (2024), *as amended* (Aug. 16, 2024). *Accord RL Liquidators*, No. 2:24-CV-02096-JHC, 2025 WL 2052611, at *6 (W.D. Wash.

July 15, 2025) ("[I]t does not appear that [plaintiff] could use the dispute process to resolve problems with the dispute process itself.").[4]

Defendant also argues that "more fundamentally," plaintiff's CPA claim contains "a fatal flaw" in that it fails to allege defendant's unfair acts were "directed at the public or otherwise had any 'deceptive capacity affecting the public in general.'" Dkt. 44 at 15:9–21 (citing *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744 (1997)). But in this Court's reading of *Hangman Ridge* and subsequent decisions from the Washington State Supreme Court, it is only alleged *deceptive* acts that must have the capacity to deceive a substantial portion of the public. 105 Wn.2d at 785 (1986); *Klem*, 176 Wn.2d at 787 (2013) ("[A]n act or practice can be unfair without being deceptive . . . ."); *Greenberg*, 3 Wn.3d at 455–59 (2024), *as amended* (Aug. 16, 2024) ("[O]ur CPA simply has no limitations on the range of effect the defendant's [unfair] conduct must have for a plaintiff to state a cognizable claim to relief."). Further, while the Washington State Legislature has made clear that the CPA "shall not be construed to prohibit acts or practices . . . which are not injurious to the public interest," RCW 19.86.920, it has also declared that where, as here, a plaintiff is pursuing a private action under the

[4] Unlike in *RL Liquidators*, here plaintiff's complaint does not state *when* plaintiff allegedly became aware that Amazon uses an algorithm to set liquidation prices in a way that violates the Liquidation Agreement § 2.1. No. 2:24-CV-02096-JHC, Dkt. 69 at 20:4–14 (W.D. Wash. March 20, 2026). *See also* Dkts. 1, 31. Thus, this Court does not follow the finding in *RL Liquidators* that plaintiff in that matter "could have avoided harm associated with the use of the algorithm" because plaintiff in that matter alleged "Amazon told it of the algorithm in March 2022" yet plaintiff "chose to reenter into the Agreement on November 8, 2022." *Id.*

CPA, the plaintiff may establish an unfair or deceptive act or practice is "injurious to the public interest" by showing the alleged act or practice "(a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons." RCW 19.96.093. *See also* Dkt. 41 at 25:16–21 ("Nothing in [the WCPA's] language requires that the plaintiff must be a consumer . . . .") (quoting *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 39 (2009)). As discussed in more detail below (II.D.2), plaintiff has plausibly alleged that defendant's unfair acts in relation to liquidation merchandise injured other persons, had the capacity to injure other persons, and have the capacity to injure other persons. *Id*. *See also* *Hangman Ridge*, 105 Wn.2d at 790–91 (1986). Therefore, the Court finds that plaintiff has plausibly alleged an unfair act or practice under the CPA.[5]

### 2. Public Interest Impact

#### a. Likelihood That Additional Plaintiffs Will Be Injured in Exactly the Same Fashion

"Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest." *Hangman Ridge*, 105 Wn.2d at 790 (1986). However, where the transaction at issue "was essentially a private dispute,"

> . . . it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest. *McRae v. Bolstad, supra,* 101 Wash. at 166, 676 P.2d 496. Factors indicating public interest in this context include:

[5] Because showing an unfair act or practice is sufficient to establish the first element of a CPA claim, *Klem*, 176 Wn.2d at 787, the Court need not analyze plaintiff's allegation of a deceptive act or practice.

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present. The factors in both the "consumer" and "private dispute" contexts represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact.

*Id*. at 790–91. On this issue, the court's analysis in *RL Liquidators* is again instructive. No. 2:24-CV-02096-JHC, Dkt. 69 at 22:13–24:3 (W.D. Wash. March 20, 2026). As an initial matter, here, as in *RL Liquidators*, plaintiff alleges "no facts" in its complaint that would support an allegation of downstream consumer harm in the form of inflated prices for liquidated goods resulting from defendant's alleged conduct. *Id*. *See also* Dkt. 1. However, unlike in *RL Liquidators*, where the court found plaintiff had alleged "no facts" making injury to other liquidators plausible, here plaintiff has indeed alleged facts indicating "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion." *Id*.; *Hangman Ridge*, 105 Wn.2d at 790-91 (1986). *See also* RCW 19.96.093. In its complaint, plaintiff alleges that "[o]n information and belief, Amazon Services engaged in the same improper conduct with other liquidators." Dkt. 1 at ¶ 68. *See also id*. at ¶¶ 29, 31. In addition, the parties have identified two other cases in which liquidators alleged they were injured in exactly the same fashion as plaintiff here was allegedly injured. *See* Dkt. 41, Ex. A, B (attaching *RL Liquidators,* 2025 WL 2052611; *The Jay Group LTD. vs. Amazon.com Services LLC*, No. 25-2-02266-8

SEA).[6] Therefore, Plaintiff has alleged sufficient facts to raise a plausible inference of public interest in this case.

**b. Additional Factors**

There are additional factors the Court may use when considering whether or not public interest impact has been shown in an essentially private dispute, but "not one of these factors is dispositive, nor is it necessary that all be present." *Hangman Ridge*, 105 Wn.2d at 790 (1986). As the court explained in *Falcon Props. LLC v. Bowfits 1308 LLC*, 16 Wn. App. 2d 1, 13 (2020), cited by defendant at Dkt. 44 at 13:9–11, these additional factors exist to help courts determine whether there is, in the end, a likelihood that additional plaintiffs have been or will be injured in exactly the same fashion. *Falcon*, 16 Wn. App. 2d at 13 (citing *Bloor v. Fritz*, 143 Wn. App. 718, 737 (2008)). Here, this Court has already found that plaintiff has plausibly alleged "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion," based on plaintiff's "information and belief" (Dkt. 1 at ¶ 68. *See also id*. at ¶¶ 29, 31) and two other cases in

[6] In *RL Liquidators*, Judge John H. Chun in June in granted Amazon's motion for default judgment against RL Liquidators in the amount of $47,278,807.53, after RL Liquidators failed to plead or otherwise defend against Amazon's counterclaims in that matter. No. 2:24-CV-02096-JHC, Dkts. 73, 77, and 78 (W.D. Wash. Feb. 19, 2026). But Judge Chun's default judgment decision was not a decision on the merits of RL Liquidators' claims, which Judge Chun had earlier dismissed without prejudice after RL Liquidators failed to prosecute the claims. *Id.* at Dkt. 70. Thus, the disposition of *RL Liquidators* does not negate the plausibility of plaintiff's claim that "Amazon Services engaged in the same improper conduct with other liquidators." Dkt. 1 at ¶ 68. *See also id*. at ¶¶ 29, 31. In *Jay Group*, the court granted Amazon's motion to dismiss The Jay Group's CPA claim in August 2025 and denied The Jay Group's motion for reconsideration in August 2026. No. 25-2-02266-8 SEA. *See also* Dkt. 64, 83. However, as discussed below, *see* II.D.2.c, this Court disagrees with the *Jay Group* court's analysis of the CPA's public interest requirement in the context of private disputes. Therefore, the disposition of *Jay Group* does not negate the plausibility of plaintiff's claim that "Amazon Services engaged in the same improper conduct with other liquidators." Dkt. 1 at ¶ 68. *See also id*. at ¶¶ 29, 31.

which liquidators alleged they were injured in exactly the same fashion as plaintiff here was allegedly injured. *See* Dkt. 41, Ex. A, B (attaching *RL Liquidators,* 2025 WL 2052611; *Jay Group*, No. 25-2-02266-8 SEA). *See also Hangman Ridge*, 105 Wn.2d at 790-91 (1986).

Even so, this Court will consider the additional factors indicating public interest impact and finds that plaintiff here plausibly alleges two of the four additional factors. Plaintiff plausibly alleges that plaintiff and Amazon occupy "unequal bargaining positions," with Amazon occupying the superior bargaining position. Dkt. 1 at ¶ 69. Plaintiff also plausibly alleges that the acts at issue in this matter occurred in the course of defendant's business. Dkt. 1. (Plaintiff does not allege the two remaining additional factors: that defendant actively solicited plaintiff or others, Dkt. 1 at ¶¶ 19–22, or that defendant advertised to the general public regarding liquidation merchandise or services, Dkt. 1.)

Altogether, then, this Court has been presented with more "indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact" than were presented in *Greek Islands Cuisine, Inc. v. YourPeople, Inc.*, No. 4:24-CV-5045-TOR, 2025 WL 35968, at *5 (E.D. Wash. Jan. 6, 2025), a case cited by both parties. Dkts. 41 at 27:12; 44 at 14:12. In *Greek Islands*, the court allowed a CPA claim to continue based on one "not particularly strong" allegation in plaintiff's Third Amended Complaint. No. 4:24-CV-5045-TOR, 2025 WL 35968, at *5 (E.D. Wash. Jan. 6, 2025). Plaintiff's "not particularly strong" allegation was that a similar incident had occurred and, therefore,

others could potentially have been similarly injured in the past and could potentially be similarly injured in the future. *Id*. Like the *Falcon* court, the *Greek Islands* court appears to have viewed "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion" as dispositive on the issue of public interest impact, even where the additional factors do not support public interest impact. *Id*. *See also Falcon*, 16 Wn. App. 2d at 13 (citing *Bloor*, 143 Wn. App. at 737). Ultimately, the *Greek Islands* court found that even though plaintiff had made an insufficient showing on the additional factors, plaintiff's complaint contained the "not particularly strong" allegation that others had "experienced loss in a similar way" and therefore, "for the purpose of a Rule 12(b)(6) Motion, the Court accept[ed] the factual allegations as supporting a cognizable legal theory that others were affected by the same conduct. . . ." *Id*. This was so "[r]egardless of whether this dispute is consumer or private in nature." *Id*. Therefore here, where plaintiff has plausibly alleged two additional factors and the likelihood injury to additional plaintiffs, the scales tip toward a showing of public interest impact.

**c. *Goodyear* Is Neither Applicable Nor Persuasive**

This Court has considered an additional case cited by defendant (Dkt. 44 at 13:16–17) that states: "When an unfair or deceptive act only affects a select few in a niche market, as here, it does not affect 'public interest.'" *Spokeo, Inc. v. Whitepages, Inc.*, 12 Wn. App. 2d 1076 (2020) (unpublished) (citing *Goodyear*, 86 Wn. App. at 744–45 (1997)). But the unpublished Washington State Court of Appeals opinion in *Spokeo* is not binding on this Court or any other courts. Furthermore, the case cited by the *Spokeo* court,

*Goodyear*, does not declare that those who operate in niche markets can never show public interest impact for a CPA claim. 86 Wn. App. at 744–45 (1997). Rather, *Goodyear* holds that tire dealers who contracted with Goodyear in the 1990s were relatively sophisticated parties and therefore were "not representative of bargainers vulnerable to exploitation." *Id*. This appears to have been a comment on relative bargaining power under the specific facts of that case, not a categorical statement about niche markets and the public interest. *Id*. Further, *Goodyear* was decided in 1997 and involved the relatively straightforward matter of tire sales in Eastern Washington, not the complex relationship alleged here between a global online retailer headquartered in Seattle, its many FBA sellers, its various liquidators, and its liquidation algorithm. *Id*. *See also* Dkt. 1. In this Court's view, it does not logically follow from the relative sophistication of Xcess that the company should have been able to specifically predict that Amazon would—as alleged here, in *RL Liquidators*, and in *Jay Group*—deploy an algorithm that would set liquidation merchandise prices in violation of the terms of the Liquidation Agreement. Dkts. 1 at ¶¶ 18–22, 68; 41, Ex. A, B. *See also* Liquidation Agreement § 2.1 (Dkt. 31). As a result, this Court finds that the *Spokeo* court's interpretation of *Goodyear* is neither applicable to this matter nor persuasive.

The Court therefore finds that by presenting (1) a plausible allegation of "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion," (2) a plausible allegation that the acts alleged occurred in the course of defendant's business, and (3) a plausible allegation that plaintiff and defendant occupy

"unequal bargaining positions," plaintiff here has sufficiently shown "indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact." *Hangman Ridge*, 105 Wn.2d 778 at 790-91 (1986).

**3. Occurring in Trade or Commerce, Injury to Plaintiff, Causation**

The remaining factors for a CPA claim—"occurring in trade or commerce," "injury to plaintiff in his or her business or property," and "causation"—are not contested by defendant. Dkts. 28 at 21–23; 44 at 13–15. Accepting the allegations in plaintiff's complaint as true, the Court finds that plaintiff has plausibly alleged that the acts at issue here occurred in trade or commerce and were the cause of injury to plaintiff's business or property. Dkt. 1. *See also Klem*, 176 Wn.2d at 782 (2013) (quoting *Hangman Ridge*, 105 Wn.2d at 780 (1986)).

Therefore, plaintiff has sufficiently alleged its CPA claim.

**E. Fourth Cause of Action: Tortious Interference With Prospective Business Relationship**

**1. Choice of Law**

As an initial matter, the Court must decide whether the laws of Washington State or Ohio law apply to plaintiff's tort claims. Defendant argues Washington law applies while plaintiff argues Ohio law applies. Dkts. 28 at 16:18–18:25; 41 at 20:1–21:13. Both parties agree that Ohio law governs the choice-of-law inquiry. *Id*. (citing *Newton v. Thomason*, 22

F.3d 1455, 1459 (9th Cir. 1994)). Further, both parties agree that under Ohio law, the applicable choice-of-law framework is set out in the Restatement (Second) of Conflict of Laws. *Id*. (citing *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 342 (1984)). Under this framework, in tort actions "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Morgan*, 15 Ohio St. 3d at 342 (1984).

Plaintiff brings two tort claims: Tortious interference with prospective business relationship and defamation. Dkt. 1 at ¶¶ 71–83. As alleged in plaintiff's complaint, the claim of tortious interference rests on the defamation claim. *Id.* at ¶ 11 ("[Defendant] later interfered with Xcess's prospective business relationship with Liquidity Services, Inc. ('Liquidity Services') by defaming Xcess."). As alleged, both of these tort claims ultimately trace to plaintiff's allegation that an Amazon Services manager falsely told Liquidity Services, another liquidator, "that Xcess dealt in 'donated' goods, which has significant negative connotations in the liquidation industry." *Id*. Plaintiff alleges that at the time, "Xcess and Liquidity Services were in advanced stages of negotiation for Xcess to purchase a portion of the products that Liquidity Services anticipated liquidating for Amazon." *Id*. Plaintiff alleges that Liquidity Services told plaintiff that Liquidity Services abruptly ended their negations because of the Amazon Services manager's statement about Xcess dealing in "donated" goods. *Id*.

Because plaintiff's tortious interference claim rests on its defamation claim, the Court's choice of law analysis will begin with plaintiff's defamation claim. Plaintiff's

complaint does not allege any facts concerning the location of either the Amazon Services manager who allegedly made the defamatory statement or the individual(s) alleged to have heard (or perhaps read) the alleged defamatory statement. Dkt. 1. Nor does plaintiff's complaint describe the alleged mechanism for communicating this statement (i.e., one-on-one phone call, e-mail to recipients in multiple states, etc.). *Id*. This Court therefore cannot discern, on the facts pled, whether it should apply § 149 of the Restatement (Second) of Conflict of Laws (the general rule concerning publication of defamatory matter) or § 150 (an exception to the general rule that is triggered by "multistate publication of an aggregate communication"). Depending on the alleged location of a speaker and the alleged place(s) of publication of the defamatory statement, these two sections can end up pointing in differing directions with regard to place of injury. *Compare* § 149 cmt. d *with* § 150 cmt. e, f. Plaintiff does argue that § 150 cmt. f applies here, Dkt. 41 at 21:6–8, but plaintiff's failure to allege facts supporting the application of § 150 causes this argument to carry no weight. Lacking any allegation as to where the defamatory statements alleged in this matter were made or published, the Court proceeds, as it would in any event, to the question of whether "another jurisdiction has a more significant relationship to the lawsuit." *Morgan*, 15 Ohio St. 3d 339 at 342 (1984). *Accord Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, No. 3:10 CV 1590, 2013 WL 4594020, at *4 (N.D. Ohio Aug. 26, 2013), *aff'd*, 774 F.3d 1065 (6th Cir. 2014).

> To determine the state with the most significant relationship, a court must then proceed to consider . . . (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality,

> place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of the Restatement (Second) of Conflict of Laws] which the court may deem relevant to the litigation. All of these factors are to be evaluated according to their relative importance to the case.

*Id*. As discussed above, plaintiff has alleged no facts regarding the place of the injury or the place where the conduct causing the injury occurred. Dkt. 1. Plaintiff alleges that it is an Ohio limited liability company with its principal place of business in Ohio while Amazon Services is a Delaware limited liability company with its principal place of business in Seattle. *Id*. at ¶¶ 13, 14. Lacking more information on the alleged place of injury, these allegations concerning the parties' principal places of business are a wash. A great weight thus comes to rest on this Court's determination of the place where the relationship between the parties is located. *Morgan*, 15 Ohio St. 3d 339 at 342 (1984). While the Court is willing to revisit this determination upon the pleading of additional facts, based upon the limited facts alleged in plaintiff's complaint the Court determines that the relationship between the parties is located in Seattle. Dkt. 1 at ¶¶ 14, 20. Therefore, the Court will apply Washington State law to plaintiff's defamation claim. (With that claim's sufficiency being analyzed below, at II.F.)

For the choice of law analysis on the tortious interference claim, plaintiff's principal place of business carries more weight. *Avery Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 897–98 (N.D. Ohio 2013) (applying California law where plaintiff's principal place of business was California and other relevant factors did

not weigh in favor of applying another state's law). Thus, the Court will apply Ohio law to plaintiff's tortious interference claim. However, the *Avery Dennizon* court had more alleged facts to work with than does this Court. *Id*. *See also* Dkt. 1 at ¶¶ 77–83. Therefore, this Court is willing to revisit this determination, too, upon the pleading of additional facts that would suggest a different choice of law outcome.

**2. Tortious Interference**

Under Ohio law, tortious interference with a business relationship occurs when a plaintiff shows "(1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and; (4) damages resulting therefrom." *Wauseon Plaza, Ltd. P'ship v. Wauseon Hardware Co.*, 156 Ohio App. 3d 575, 588 (2004). "Tortious interference with business relationships includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Id*. "The interference, however, must be intentional because Ohio law does not recognize negligent interference with a business relationship." *Id*.

Taking the factual allegations in plaintiff's complaint as true and accepting reasonable inferences from those facts, plaintiff has plausibly alleged tortious interference with a prospective business relationship under Ohio law. Dkt. 1 at ¶¶ 11, 45–53, 71–76. *See also Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, No. 1:15-CV-737, 2016 WL 3999315, at *5–6 (S.D. Ohio July 26, 2016); *Soo Park*, 851 F.3d at 928 (9th Cir. 2017).

**F. Fifth Cause of Action: Defamation**

In Washington State, "[t]he elements a plaintiff must establish in a defamation case are falsity, an unprivileged communication, fault, and damages." *Mohr v. Grant*, 153 Wn.2d 812, 822 (2005). Plaintiff here alleges that an "Amazon Services Manager" falsely told Liquidity Services, another liquidator, that Xcess dealt in "donated" goods. Dkt. 1 at ¶¶ 11, 45–53, 77–83. Because "donated" goods "has significant negative connotations in the liquidation industry," plaintiff alleges that this false statement caused it to lose "a valuable contract with Liquidity Services." *Id*.

While defendant here argues that plaintiff has not sufficiently pled when, where, and to whom the alleged defamatory statement was made, defendant's authorities are distinguishable from the present matter. In *Phillips v. World Pub. Co.*, 822 F. Supp. 2d 1114, 1118 (W.D. Wash. 2011), plaintiff had failed to allege "what statements were actually made" by the media defendant, the *Tulsa World*. Here, in contrast, plaintiff alleges that an Amazon Services Manager falsely told Liquidity Services that plaintiff dealt in "donated" goods. Dkt. 1 at ¶¶ 48–52. Plaintiff's allegation of a false statement about "donated" goods also distinguishes this case from *Campbell v. Dell Techs., Inc.*, No. C24-711-RSM, 2024 WL 3792703, at *2 (W.D. Wash. Aug. 13, 2024), where the court's primary issue was that plaintiff had provided "no information regarding what was possibly said," leaving the court unable to "discern whether Defendants made defamatory remarks, gave personal opinions, or whether they said anything at all."

The Court agrees with defendant that plaintiff has not pled who, exactly, made the "donated" statement (beyond an "Amazon Services Manager") or precisely when the "donated" statement was made (although the Court can infer from plaintiff's complaint that the statement was made sometime after June 2024). Dkt. 1 at ¶¶ 45, 48. In a complaint implicating the First Amendment, more would likely be required. *Flowers v. Carville*, 310 F.3d 1118, 1130–31 (9th Cir. 2002). But this defamation claim does not appear to implicate the First Amendment, nor does either party suggest it could (Dkts. 28, 41, 44), and plaintiff's complaint certainly alleges "the nature of the statements." *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1085 (9th Cir. 1976). *See also* Dkt. 1 at ¶¶ 11, 45–53, 77–83. Moreover, defendant, while denying that any defamation occurred, stated in its Motion to Transfer Venue that it was able to identify the person alleged to have made the defamatory statement. Dkt.10 at 5 ("The manager that Xcess's Complaint refers to is based in Seattle . . . ."). *See also* Dkt. 10-1 at ¶ 6. ("I believe I am the 'Amazon Services Manager" that Xcess's Complaint refers to in paragraph 48 . . . .").

Therefore, taking the factual allegations in plaintiff's complaint as true and accepting reasonable inferences from those facts, plaintiff has plausibly alleged the elements of a defamation claim under Washington State law: "falsity, an unprivileged communication, fault, and damages." *Mohr*, 153 Wn.2d at 822; Dkt. 1 at ¶¶ 11, 45–53, 77–83. *See also Soo Park*, 851 F.3d at 928.

## III. Conclusion

For all the foregoing reasons, the Court DENIES defendant's second motion to dismiss (Dkt. 28).

IT IS SO ORDERED.

Dated this 23rd day of October, 2026.

Robert S. Lasnik
United States District Judge